# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| T.D. WILLIAMSON, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-CV-0223-CVE-PJC |
| | ) | |
| ASSOCIATE ENGINEERS, INDIA, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER ADMINISTRATIVELY CLOSING CASE

Now before the Court are Defendants' Motion to Compel Arbitration and for Stay of the Action and Supporting Brief (Dkt. # 42), and Plaintiff's Opposed Motion for Leave to File its Second Amended Complaint (Dkt. # 45). Defendants argue that the parties agreed to arbitrate any claims arising out of a commercial agreement and they ask the Court to compel arbitration of the claims raised in plaintiff's first amended complaint. Plaintiff requests leave to file a second amended complaint to clarify its "poor choice of words" to correct any misperception that it intended to assert claims arising under the parties' commercial agreement and, if this request is granted, it asks the Court to deny defendant's motion to compel arbitration. Dkt. # 56, at 3.

## I.

T.D. Williamson, Inc. (T.D. Williamson) is a company based in Tulsa, Oklahoma that "offers a variety of pipeline integrity solutions for onshore and offshore applications." Dkt. # 12, at 7. T.D. Williamson entered into a Commercial Agreement (Agreement) with Associate Engineers, India (AEI), in which AEI agreed to manufacture On Line Repair Clamps (LRCs) that T.D. Williamson intended to re-sell to its customers for use in repairing damaged or leaking pipelines. Id. T.D. Williamson had the exclusive right to purchase LRCs from AEI, and it was authorized to market and

distribute the LRCs under its brand name.  Id.   Under the Agreement, T.D. Williamson received a rebate based on the volume of LRCs it purchased from AEI.[1]  Dkt. # 42-1, at 12.  T.D. Williamson claims that the LRCs were defective and that AEI "was well aware defects in manufacturing and design would forseeably create hazardous conditions potentially jeopardizing property, people and the environment."  Dkt. # 12, at 7.  Under the Agreement, AEI agreed to "defend, indemnify and hold harmless [T.D. Williamson], its officers, directors, agents, and employees against any product liability claims that any of the Products were negligently manufactured or designed."  Dkt. # 42-1, at 3.

The Agreement included a choice of law provision that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma, U.S.A., except for any Oklahoma choice of law statute or rules, which would otherwise require the application of the substantive law of a jurisdiction other than Oklahoma."  Id. at 6.  The parties also agreed that:

> Any material dispute, controversy, or difference, arising out of this Agreement shall be finally settled by arbitration pursuant to the International Commercial Arbitration Rules of the American Arbitration Association, if the parties cannot resolve the dispute.  The parties agree that the costs and expenses of the arbitration shall by borne by the parties as determined by the arbitrators; provided however, each party shall pay the fees & costs of their own expert and legal counsel.  The parties agree that the venue of arbitration will be in New York, New York, U.S.A., and the language of the arbitration shall be the English language. [T.D. Williamson] and AEI agree that arbitration shall not be governed by the Indian Arbitration Act or by the laws of India.  The arbitration shall be subject to the rules and laws of the State of Oklahoma.  The parties agree to be bound by any award issued as a result of such arbitration.

Id.  The Agreement provides that it would terminate "at the end of three (3) years from the effective date of this Agreement."  Id. at 5.  The effective date of the Agreement was July 15, 2003.  Id. at 7.

---

[1]  AEI has produced evidence that it issued rebate checks to T.D. Williamson pursuant to the Agreement until at least 2011.  Dkt. # 49-3.

T.D. Williamson states that it sold over 2,500 LRCs that it purchased from AEI, and the sales to third parties occurred between 2002 and 2012.  Dkt. # 12, at 8.  T.D. Williamson acknowledges that the Agreement "purportedly had a term of only three years," but it states that the parties continued to operate under the Agreement throughout the course of their business relationship, and that the Agreement should be deemed "in effect from the date of its original execution through all times relevant to this lawsuit."  Id.  Beginning in May 2011, T.D. Williamson began receiving reports from its customers concerning problems with the LRCs, and it opened an investigation into the defective LRCs reported by customers and other LRCs in its possession.  Id. at 9.  T.D. Williamson claims that its investigation revealed the following manufacturing and design defects with the LRCs:

a.      Many if not all LRCs designed and manufactured by AEI are defective because the seals do not maintain pressure, causing the LRCs to fail and leak. The clamp seals are defective in at least two ways.  The seals do not stay in place and/or the seals are tearing when the clamp is installed.

b.      Many if not all LRCs designed and manufactured by AEI are defective because they will not meet their rated operating temperature.  AEI placarded each LRC with a name plate identifying the maximum operating temperature to be 212°F.  Testing of the LRCs has determined they fail at 180°F and the true operating temperature is therefore much lower.

c.      Many if not all of the LRCs designed and manufactured by AEI are defective in that they do not accommodate the multiple and ordinary manufacturing variances that are found in pipe.  This ordinary and expected variability causes the LRCs to be unable to close around the pipe, rendering the LRC ineffective.

d.      Many if not all of the LRCs designed and manufactured by AEI have welding defects in the weld between the main body of the LRC and the bolted flange of the LRC.  Many if not all of the LRCs have welding defects in the welding attaching the stiffening ring to the main body of the LRC and the bolted flange.  A manufacturing defect at the stiffening ring occurs when AEI welded the stiffening ring onto the clamp, which may produce a leak when the LRC is welded to a pipe.  The issue may affect some if not all LRCs that

3

are 24 inches and larger in the 400 class and all LRC sizes in the 600 and 900 class.

e.      Many if not all of the LRCs designed manufactured by AEI have a manufacturing defect in that AEI did not control the depth of the "plunge cut hole" at the bolted flange.  When the plunge cut hole is too deep, it enters into a part of the LRC where there is no weld.  When a pipe system is pressurized, the clamp may leak through the plunge cut hole.

f.      Many if not all of the LRCs designed and manufactured by AEI have insufficient clearance between nuts and the vertical stiffening ring on the body of the LRC.  This lack of proper clearance prevents a wrench or socket from engaging the nut and prevents the nut from properly tightening, which interferes with the way the clamp seals around the pipe.

g.      Many if not all of the LRCs are out of specification with respect to the stated manufacturing tolerances.

h.      Many if not all of the LRCs contain a manufacturing or design defect in that the seal groove is painted.  Paint in the seal groove can disbond and cause the LRC to leak.

Id. at 9-10.  T.D. Williamson further alleges that AEI failed to comply with a requirement under the Agreement to obtain certification for and to perform certain quality control procedures when manufacturing the LRCs.  Id. at 11.  T.D. Williamson claims that it was required to recall all LRCs manufactured by AEI.  Id.

On April 17, 2013, T.D. Williamson filed this case, alleging claims of breach of contract, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness, indemnification, fraud, and manufacturer's products liability.  Dkt. # 2.  T.D. Williamson filed an amended complaint to add party-defendants.  Dkt. # 12.  In the complaint and the amended complaint, T.D. Williamson's claims of breach of contract, breach of express warranty, and indemnification expressly rely on the Agreement.  On June 20, 2013, defendants sent a letter to plaintiff's counsel and demanded that plaintiff comply with the arbitration provision in the

4

Agreement. Dkt. # 42-4.  Plaintiff's counsel responded by e-mail and claimed that the Agreement, including the arbitration provision, expired in 2006.  Dkt. # 42-5.  Plaintiff's counsel also claimed that plaintiff's claims arose after the expiration of the Agreement, and there were no claims that could be submitted to arbitration under the Agreement. Id.  Defendants responded to the e-mail and pointed out language in the original and amended complaints in which plaintiff alleges that the parties operated under the Agreement at all times relevant to the lawsuit, and defendants asked plaintiff to reconsider its position on arbitration.  Dkt.. # 42-6.  On June 27, defendants filed a motion to compel arbitration (Dkt. # 42) of all claims asserted in the amended complaint.  Before responding to the motion to compel arbitration, plaintiff filed a motion for leave to file a second amended complaint "to make clear it is only seeking damages related to the sale and purchase of LRC's [sic] sold to it by Defendants after July 15, 2006.  Dkt. # 45, at 3.

## II.

Plaintiff requests leave to file a second amended complaint to delete any claim that could have arisen while the Agreement was in effect.  Dkt. # 45.  Defendants objects to plaintiff's motion on the ground that plaintiff is acting in bad faith by attempting to assert allegations that contradict its original and amended complaints, and defendants argue that plaintiff filed the motion for the sole purpose of avoiding its obligation to submit its claims to arbitration.  Dkt. # 50.

Under Fed. R. Civ. P. 15(a)(2), after the opposing party has served a responsive pleading, "a party may amend its pleadings only with the opposing party's written consent or the court's leave."  Minter v. Prime Equipment Co., 451 F.3d 1196, 1204 (10th Cir. 2006).  The decision to grant leave to amend is within the discretion of the district court.  Bradley v.Val-Majias, 379 F.3d 892, 900-91 (10th Cir. 2004).  "In the absence of any apparent or declared reason-such as undue

delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance . . . the leave sought should, as the rules require, be 'freely given'" <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962). "Bad faith with regard to a Rule 15 motion can be inferred if the proposed amendment directly contradicts allegations made in the original pleadings, such that the original and amended factual accounts cannot be reconciled." <u>Two Moms and a Toy, LLC v. Int'l Playthings</u>, LLC, 2011 WL 5593178, *3 (D. Colo. Nov. 17, 2011). It may not be bad faith to seek leave to amend in order to clarify the allegations of the complaint, even in response to a motion to dismiss, if the proposed amendments are true clarifications, rather than contradictions, of allegations stated in a prior pleading. <u>First American Mortg., Inc. v. First Home Builders of Florida</u>, 2010 WL 5230902, *3 (D. Colo. Dec. 15, 2010).

Plaintiff argues that it made a "poor choice of words" in the original and amended complaints by stating that the parties continued to operate under the Agreement after it expired in 2006, and that it did not actually intend to allege claims arising under the Agreement. Dkt. # 56, at 3. Plaintiff claims that it is "attempting to get its pleadings in order with the facts and legal theories it seeks to prove." <u>Id.</u> at 1. However, plaintiff admits that no discovery has occurred and plaintiff has identified no new evidence that it has reviewed since the filing of the amended complaint and its motion to amend. <u>See</u> Dkt. # 45, at 2. There is no basis to infer that plaintiff is requesting leave to amend to clarify its factual allegations in light of new evidence. Instead, a review of the amended complaint and the proposed second amended complaint shows that plaintiff is making contradictory representations about the nature of its claims. In the amended complaint, plaintiff makes the following allegations:

20.     The Agreement had an effective date of 15 July 2003, although certain of the LRCs at issue in this lawsuit were sold before that date.  Although the Agreement purportedly had a term of only three years, the Agreement, in whole or in part, was continued via express agreement between the Plaintiff and AEI, and/or through course of dealings between the Plaintiff and AEI, and/or through implied agreement between Plaintiff and AEI, and/or through estoppel.  Consequently the Agreement, in whole or in part, was in effect from the date of its original execution through all times relevant to this lawsuit. . . .

28.     At the time AEI defectively manufactured and/or designed each LRC there was a binding and valid agreement between AEI and Plaintiff.  Plaintiff performed under the Agreement by marketing and distributing the LRCs both in the United States and worldwide. . . .

31.     The Agreement warranted the LRCs sold by AEI to Plaintiff would be free from defects in materials and workmanship for a period of 18 months from the date of dispatch or 12 months from the date of operation, whichever is earlier. . . .  Plaintiff hereby claims breach of warranty for those LRCs still within the express warranty period of the Agreement, if any.  Said breach or breaches of warranty by AEI were the cause of those damages Plaintiff seeks in this lawsuit. . . .

40.     The Agreement contains a provision under Section 5.2 requiring AEI to indemnify and hold harmless Plaintiff against any claims that any of the LRCs were negligently manufactured or designed. . . .

42.     AEI and [AIT Consulting Group, Inc.] made material misrepresentations in regards to the Agreement, during the course of dealings between AEI and Plaintiff concerning the Agreement and/or during the course of dealings concerning each LRC sold that AEI would comply or substantially comply with quality control processes . . . .  Plaintiff relied upon the representations in the determination to enter the Agreement and/or to purchase each LRC at issue in this lawsuit and/or to continue marketing and distributing the LRCs for all times relevant to this lawsuit. . . .

Dkt. # 12, at 8, 12, 13, 15, 16.  In the proposed second amended complaint, plaintiff now claims that:

16.     After 15 July 2006 AEI designed, manufactured and sold LRCs to Plaintiff subject to individually negotiated POs.  Plaintiff purchased each LRC subject to the terms and conditions as set forth within each individually negotiated PO. . . .

18.    Plaintiff purchased approximately 2,275 LRCs from AEI after the Agreement expired on 15 July 2006. . . .

23.    After expiration of the Agreement, AEI made various representations concerning its quality control processes which have proven false. . . .

27.    After 15 July 2006 each LRC sold by AEI to Plaintiff was sold on an individually negotiated basis and subject to the terms and conditions within each individual PO or other similar document issued by [T.D. Williamson] to AEI.  For each individual LRC sold there was a formation of a contract, a breach of that contract and actual damages suffered by Plaintiff as a result of AEI's breach.

The clear inference is that plaintiff's purpose for seeking leave to file a second amended complaint is to avoid arbitration.  In both the original and amended complaints, plaintiff plainly alleges that the Agreement remained in full force and effect during "all periods relevant to this lawsuit," and plaintiff changed its position only after it received defendants' demand to arbitrate plaintiff's claims.   Plaintiff makes allegations in the proposed second amended complaint that directly contradict the allegations of the original and amended complaints, and there is no possibility that plaintiff's error could be classified as an innocent mistake or a clarification based on newly discovered evidence.  "Courts are free to consider direct contradictions between earlier pleadings and a proposed amended pleading in determining whether to grant leave to amend, particularly when the proposed amendments concern facts clearly within the plaintiff's knowledge when previous complaints were filed.  Kant v. Columbia University, 2010 WL 807442, *7 (S.D.N.Y. Mar. 9, 2010). As a party to the Agreement, the fact that the parties did or did not continue to operate under the Agreement after July 15, 2006 was clearly within plaintiff's knowledge when this case was filed, and plaintiff may not adopt an alternative position in an amended pleading merely to avoid the

consequences of its prior representations to defendants and the Court.[2]  The Court finds that the proposed second amended complaint does contain contradictory factual allegations that are made for the purpose of avoiding arbitration, and plaintiff's motion to amend (Dkt. # 45) should be denied due to bad faith.  For the purpose of ruling on defendants' motion to compel arbitration, the operative pleading is the amended complaint (Dkt. # 12), and the Court will rely on the amended complaint to determine the nature of plaintiff's claims against defendants.

### III.

Defendants ask the Court to compel arbitration of each of plaintiff's claims, because the parties' Agreement contains a broad arbitration provision and plaintiff's claims fall within the scope of the arbitration provision.  Plaintiff responds that the Agreement expired by its own terms and there is no presumption of arbitrability for claims arising under an expired contract.  If the Court finds that the arbitration agreement is enforceable, plaintiff asks the Court to sever any arbitrable claims and retain jurisdiction over any non-arbitrable claims, and it argues that this Court should decline to stay these proceedings over any non-arbitrable claims pending arbitration.

The Federal Arbitration Act, 9 U.S.C. § 1 et seq. (FAA), provides that a "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Section 2 of the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts . . . ."  Buckeye Check Cashing, Inc. v.

---

[2]     Defendants have not filed a motion for sanctions, but they have cited Fed. R. Civ. P. 11 in their response to plaintiff's motion to amend.  The Court declines to sanction plaintiff based only on contradictions contained in an unfiled proposed amended pleading.

Cardegna, 546 U.S. 440, 443 (2006).  The "involving commerce" requirement of § 2 has been construed broadly to be coextensive with Congress' power to regulate interstate commerce, and the FAA "reaches not only the actual physical interstate shipment of goods but also contracts relating to interstate commerce." Comanche Indian Tribe of Oklahoma v. 49, LLC, 391 F.3d 1129, 1132 (10th Cir. 2004) (quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 401 n.7 (1967)).  The amended complaint (Dkt. # 12) is the operative pleading and it alleges that T.D. Williamson and AEI entered a contract for the manufacture and distribution of LRCs "within the United States and [to] Plaintiff's subsidiaries worldwide for resale on the global market." Dkt. # 12, at 6.  The Agreement clearly relates to interstate and foreign commerce, and the parties' arbitration agreement is government by the FAA.

"The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the "*question of arbitrability*," is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (quoting AT&T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649 (1986)).  The arbitration agreement requires the parties to arbitrate all disputes "arising out of this Agreement" but it does not require the parties to arbitrate the issue of arbitrability.  Dkt. # 42-1, at 6.   The arbitration provision in the Agreement does not expressly reserve the issue of arbitrability for arbitration, and the Court must determine whether to compel arbitration of all or any part of this case.   As the Court has noted, the FAA provides a strong federal policy in favor of enforcing arbitration agreements. ARW Exploration Corp. v. Aguirre, 45 F.3d 1455, 1462 (10th Cir. 1995). In determining if claims fall within an arbitration clause, a court must first determine whether the arbitration clause is broad or narrow. Chelsea Family Pharmacy, PLLC v. Medco Health Solutions,

10

Inc., 567 F.3d 1191, 1196 (10th Cir. 2009).  A broad arbitration provision is one that "refer[s] all disputes arising out of a contract to arbitration."  Cummings v. FedEx Ground Package System, Inc., 404 F.3d 1258, 1262 (10th Cir. 2005).  In contrast, a narrow arbitration provision "manifest[s] an intent to narrowly limit arbitration to specific disputes regarding the termination" of a contract.  Id. The arbitration agreement in this case requires the parties to arbitrate "[a]ny material dispute, controversy, or difference, arising out of this Agreement."  Dkt. # 42-1, at 6.  This qualifies as a broad arbitration provision under Cummings, because the parties agreed to arbitrate all disputes arising out of the Agreement.  Id.; see also Newmont U.S.A. Ltd. v. Ins. Co. of North America, 615 F.3d 1268, 1275 n.5 (10th Cir. 2010) ("Generally, when an arbitration provision provides for [arbitration of] any dispute 'arising out of' a particular contract, the provision is construed broadly to suggest that a given dispute is arbitrable").  When reviewing a broad arbitration provision, "there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it."  Cummings, 404 F.3d at 1261 (quoting Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001)).

Plaintiff argues that there is no presumption of arbitrability in this case, because the parties' contractual relationship terminated under the express terms of the Agreement and there is no written agreement requiring the parties to submit contractual disputes to arbitration.  However, an arbitration provision in a contract is presumed to survive the expiration of the contract.  Newmont U.S.A., 615 F.3d at 1275.  A party seeking to rebut this presumption must present evidence showing that the parties expressly or impliedly intended to repudiate the contract or that the dispute does not arise under the contract.  Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775, 781 (10th

Cir. 1998).  In this case, plaintiff challenges the validity of the entire contract after it allegedly

expired July 15, 2006.  The Supreme Court has clarified that a challenge to the validity of an entire

contract, rather than just the arbitration provision, is a matter that must be decided by an arbitrator

if the parties agreed to submit such disputes to arbitration.  Nitro-Lift Technologies, LLC v. Howard,

133 S. Ct. 500, 503 (2012) ("when parties commit to arbitrate contractual disputes, it is a mainstay

of the [FAA's] substantive law that attacks on the validity of the contract, as distinct from attacks

on the validity of the arbitration clause itself, are to be resolved 'by the arbitrator in the first

instance, not by a federal or state court'").  Plaintiff's challenge goes to the validity of the entire

contract, not just the arbitration provision, and the validity of the contract is an issue that must be

decided by the arbitrator in the first instance.  The Court has reviewed plaintiff's response and finds

no argument that could be construed as a challenge only to the enforceability of the arbitration

provision of the Agreement.[3]  The Court finds that the parties' arbitration agreement is enforceable,

and the Court will apply the presumption of arbitrability applicable to broad arbitration provisions.

The Court has determined that the arbitration agreement is enforceable, and the Court must

consider what claims asserted by plaintiff fall within the scope of the arbitration agreement.  Plaintiff

has alleged seven claims for relief: breach of contract, breach of express warranty, breach of implied

warranty of merchantability, breach of implied warranty of fitness, indemnification, fraud, and

manufacturer's products liability.  All of these claims are based on the fundamental premise that the

---

[3]     The Court notes that plaintiff's proposed second amended complaint (Dkt. # 45-1) directly
challenges the validity of the entire Agreement after July 15, 2006.  Even if plaintiff had
been permitted to file a second amended complaint, plaintiff would still be required to
submit its claims to arbitration, because the parties dispute whether the Agreement remained
in force after July 15, 2006, and they agreed to submit disputes "arising out of" the
Agreement to arbitration.  See Nitro-Lift Technologies, 133 S. Ct. at 503.

LRCs manufactured by AEI were defective and that plaintiff has incurred financial loss as a result of distributing the LRCs to its customers.  The breach of contract, breach of express warranty, and indemnification claims are based directly on the Agreement and plaintiff cites provisions of the Agreement as the basis for the claims.  These claims are clearly within the scope of the arbitration provision.  As to the two claims based on breach of an implied warranty and the manufacturer's products liability claim, these claims also "aris[e] out of" the Agreement because the claims concern alleged defects with the products manufactured by AEI under the Agreement.  Plaintiff's fraud claim is based on alleged "material representations in regards to the Agreement, during the course of dealings between AEI and Plaintiff concerning the Agreement and/or during the course of dealings concerning each LRC sold . . . ."  Dkt. # 12, at 16.  This claim also relates to the parties "rights and obligations" under the Agreement, and the fraud claim falls within the scope of the parties' arbitration agreement.  Thus, all of the claims alleged in plaintiff's amended complaint fall within the scope of the parties' broad arbitration provision, and the claims must be submitted to arbitration.  Under the FAA, the Court is required to stay this case pending completion of the arbitration proceedings.  Walker v. BuildDirect.com Technologies, Inc., 733 F.3d 1001, 1004 (10th Cir. 2013).

**IT IS THEREFORE ORDERED** that Defendants' Motion to Compel Arbitration and for Stay of the Action and Supporting Brief (Dkt. # 42) is **granted**, and all claims alleged in the amended complaint (Dkt. # 12) shall be submitted to arbitration pursuant to the parties' Agreement.

**IT IS FURTHER ORDERED** that  Plaintiff's Opposed Motion for Leave to File its Second Amended Complaint (Dkt. # 45) is **denied**.

13

**IT IS FURTHER ORDERED** that this case is **stayed** pending completion of the arbitration proceedings.  The parties shall file a joint statement advising the Court of the arbitrator's decision within 15 days of the completion of the arbitration proceedings.

**IT IS FURTHER ORDERED** that, pursuant to LCvR 41.1, the Court Clerk is directed to **administratively close** this case pending either an order of the Court reopening the action, or until this case is dismissed with prejudice by stipulation of the parties.

**DATED** this 16th day of December, 2013.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE